### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF KENTUCKY
### CENTRAL DIVISION
### LEXINGTON

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 5:25-CR-00084-GFVT-MAS** |
| | ) | |
| **STEVEN TROY BUGG,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### REPORT AND RECOMMENDATION

This matter is before the Court on Defendant Steven Bugg's ("Bugg") Motion to Suppress. [DE 20]. Bugg moves to suppress all evidence obtained because of his warrantless seizure and the subsequent searches of his person, vehicle, and hotel room on May 18, 2022. [DE 20]. In short, Bugg argues that law enforcement officers did not have sufficient suspicion to justify the initial traffic stop and search of his person. Additionally, Bugg argues that officers did not obtain his free and voluntary consent to search his vehicle and hotel room. The United States points to the existence of probable cause to arrest Bugg and his clear, voluntary consent to justify the initial seizure and searches that followed. [DE 24]. Considering all the arguments and evidence presented by the parties [DE 25 (Suppression Hearing Minutes); DE 26 (Exhibit and Witness List); DE 27 (Transcript)], the undersigned recommends the District Court deny Bugg's motion.

# I.    FACTUAL BACKGROUND

Prior to the events of May 18, 2022, law enforcement agencies were actively investigating Bugg through a variety of methods, including conducting surveillance and controlled purchases.  [DE 27, PageID# 106, 119].  Pursuant to lawful authority, these agencies were also surveilling Bugg's movements through a tracker placed on his rental vehicle, a 2021 black Toyota Camry with the Kentucky registration plate BDL 457.  [DE 27, PageID# 119; DE 20-1, PageID# 61 (Defendant's Exhibit to Motion to Suppress, Police Report)].

## A.    CONTROLLED PURCHASES

During the evidentiary hearing, Detective Scott McIntosh ("McIntosh") detailed two controlled purchases conducted with Bugg by the High Intensity Drug Trafficking Area Task Force ("HIDTA") on April 20 and April 28, 2022.  [DE 27, PageID# 146].  Although McIntosh was not present at each controlled purchase, his testimony was informed by review of the official reports and personal knowledge of the guidelines and procedures governing controlled purchases and the confidential informants ("CI") involved.  [DE 27, PageID# 161].[1]

On April 20, 2022, Detectives Tyler Morris ("Morris") and Hunter Harrison ("Harrison") met with a CI in Fayette County, Kentucky, at a predetermined location. The detectives conducted a routine pre-search of the CI and his vehicle for illegal contraband.  [DE 27, PageID# 146].  Finding none, the CI proceeded to meet Bugg at

---

[1] The original DEA case agent, Tyler Morris, was unavailable to testify at the evidentiary hearing due to a conflicting doctor's appointment for a serious shoulder injury.  [DE 27, PageID# 160].

Palomar Centre in Lexington. The CI and Bugg traveled together in Bugg's vehicle to Room 129 of the Roadway Inn Motel on Versailles Road to conduct the drug transaction. [DE 27, PageID# 147]. Following the purchase, Bugg delivered the CI back to his vehicle, who then reconvened with detectives at the predetermined location.[2] The CI purchased nearly eight ounces of methamphetamine hydrochloride, confirmed to be 99 percent pure methamphetamine by the DEA laboratory, for $1,600. [DE 27, PageID# 148]. McIntosh indicated that law enforcement officers conducted continuous surveillance from the moment the operation began through its completion. [DE 27, PageID# 150].

Detectives Morris and Harrison again met the CI on April 28, 2022, at a predetermined location in Fayette County. [DE 27, PageID# 151]. Bugg instructed the CI to meet him in the parking lot of the McDonald's on Versailles Road. Upon arrival, the CI and Bugg briefly conversed. Bugg instructed the CI to go to a car wash down the street. Both the CI and Bugg traveled to the car wash, parking in separate bays. After several minutes, a white Tahoe pulled in behind Bugg's vehicle.[3] [DE 27, PageID# 151]. Shortly thereafter, the Tahoe left, and the CI entered Bugg's vehicle, where the transaction occurred. [DE 27, PageID# 151–52]. Following the transaction, the detectives and CI followed conducted the same post-buy procedures

---

[2] During post-operation interactions, law enforcement officers will retrieve covert devices and evidence, as well as conduct a post-search of the CI and his vehicle. Additionally, officers conduct a "debriefing" of the CI, in which the CI describes the details and events of the controlled buys. [DE 27, PageID# 149].

[3] According to McIntosh, the CI suspected that the individual driving the white Tahoe supplied Bugg with the substances exchanged during the transaction. [DE 27, PageID# 151].

described above.  [DE 27, PageID# 153].  For $3,500, the CI purchased 457 grams of methamphetamine hydrochloride, which was later determined to be 85 percent pure methamphetamine by the DEA laboratory.  [DE 27, PageID# 152].

**B.    THE STOP**

On the morning of May 18, 2022, members of the Kentucky State Police ("KSP") Drug Enforcement/Special Investigations East ("DESI") and HIDTA task force, met to develop an interdiction plan for Bugg.  [DE 27, PageID# 106].[4]  During this meeting, lead officers briefed the team on the surveillance of and controlled purchases with Bugg, preparing the team to conduct a pretextual stop of Bugg as he left a hotel in Lexington, Kentucky.  Additionally, the team was informed that Bugg's license had recently expired.  [DE 27, PageID# 119].

At around 10:05 a.m., Detective Jasper White notified the team that Bugg had exited the hotel and was driving the vehicle on Harrodsburg Road.  [DE 20-1, PageID# 61].  As Bugg was traveling, KSP Sergeant Jesse Owens ("Owens") began following him in a marked police vehicle.  [DE 27, PageID# 107].  According to Owens, Bugg began watching him in the rearview mirror and swerving.  Owens deployed his emergency equipment and pulled Bugg over at a Shell gas station on South Broadway.  [DE 27, PageID# 108].  Owens approached the vehicle and asked for

---

[4] The group present for the briefing included Sergeant Tye Chavies, Sergeant Lafe Owens, Trooper First Class KJ Leavell, Trooper First Class Jack Gabriel, Trooper Josh Giles, Detective Donovan Nolan, and Detective Tyler Morris.  [DE 20-1, PageID# 61].  At the same time, Detectives Ben Spalding and Jasper White were conducting mobile surveillance on Buggs' vehicle in the Fairfield Inn Hotel parking lot.

Bugg's driver's license. Bugg was unable to produce a driver's license; however, he was eventually able to present a Kentucky identification card. [DE 27, PageID# 109].

Then, on five separate occasions, Owens asked Bugg for consent to search his vehicle. [DE 27, PageID# 109]. Each time, Bugg consented. During the search, Owens found a small amount of methamphetamine in a tissue box in the passenger compartment of the vehicle. [DE 27, PageID# 110].

During the search, Bugg stood behind the vehicle, speaking with another officer. [DE 27, PageID# 110]. While Owens conducted the search of the vehicle, KSP Trooper Jack Gabriel ("Gabriel") arrived at the scene. [Exhibit 1, Body Camera Footage ("BWC") at 00:00:24].[5] Prior to Gabriel's arrival, only two uniformed officers were in Bugg's direct vicinity. As Gabriel approached Bugg, another officer began patting him down. Gabriel then began a more invasive pat down of Bugg's person, eventually placing him in handcuffs. [BWC at 00:01:00]. After Bugg was secure, an officer bent to the ground and retrieved a bag of heroin that fell from Bugg's pants during the search of his person.[6] [BWC at 00:01:15; DE 27, PageID# 131; DE 20-1, PageID# 61].

The events that follow were not well-established on the record at the evidentiary hearing, leaving the Court to rely on the police report, submitted as an exhibit to Bugg's motion to develop the following factual summary: Morris escorted

---

[5] There is no audio available for this video.

[6] By his testimony, Owens seems to believe that the officer patting Bugg down felt the heroin, which lead to Bugg being handcuffed. [DE 27, PageID# 136]. However, there was no other testimony offered at the hearing corroborating that notion.

Bugg to a police vehicle and read his *Miranda* rights. [DE 20-1, PageID# 62]. Bugg declined the opportunity to contact an attorney and agreed to speak with Morris. Morris explained the controlled purchases to Bugg and asked if there was anything else in Bugg's hotel room. Bugg admitted that there was about one ounce of methamphetamine and a gun. Morris asked for consent to search the hotel room, and Bugg granted the request and told officers where they would find the items in the room. Two officers transported Bugg to the Fairfield Inn, where he let officers into his hotel room, Room 209. Once inside, Bugg signed a Kentucky State Police Consent to Search form. The search of Bugg's hotel room revealed a hi-point .380 caliber pistol, a small digital scale, a glass pipe with methamphetamine residue, and several plastic bags containing small amounts of methamphetamine. The total weight of all the methamphetamine found on May 18th was 55.7 grams with packaging.

On July 3, 2025, Bugg was indicted on three counts of knowingly and intentionally distributing fifty grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). [DE 1]. On August 7, 2025, the grand jury returned a superseding indictment charging Bugg with three counts of knowingly and intentionally distributing fifty grams or more of methamphetamine, all in violation of 21 U.S.C. § 841(a)(1), and one count for being a previously convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). [DE 7]. Subsequently, the undersigned issued an arrest warrant and Bugg was brought into federal custody. [DE 10].

## II.  <u>ANALYSIS</u>

Bugg argues that officers lacked sufficient legal grounds to justify the initial stop of his vehicle. Additionally, Bugg asserts that the search of his person was not

sufficiently supported by reasonable suspicion that he was armed and dangerous. Finally, Bugg claims that the United States cannot prove that he clearly and voluntarily consented to the search of his vehicle and hotel room. In sum, Bugg asks the Court to exclude the evidence obtained from all three searches.

To counter, the United States argues that probable cause to stop Bugg's vehicle was firmly established. Further, the United States asserts that Bugg was subject to arrest and, thus, the search of his person was proper as a search incident to a lawful arrest. For the vehicle and hotel room searches, the United States argues that Bugg's consent to each was sufficiently knowing and voluntary.

After reviewing each party's arguments, the Court concludes that the actions of the United States were justified and lawful.

## C. LEGAL FRAMEWORK

The Fourth Amendment provides that "no Warrants shall issue, but probable cause, supported by Oath or affirmation, and particularly, describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. An arrest or temporary detention of individuals, even during a traffic stop, constitutes a seizure under the Fourth Amendment. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975); *Whren v. United States*, 517 U.S. 806, 809–10 (1986). The Sixth Circuit has defined three distinct types of citizen-police encounters: (1) consensual encounters by a police officer, which requires no articulable level of suspicion; (2) an investigatory stop, which must be predicated upon reasonable suspicion and articulable facts—the *Terry* stop; and (3) an arrest, which requires probable cause to believe that a crime has been committed. *United States v. Flowers*, 909 F.2d 145, 147

(6th Cir. 1990). The exclusionary rule requires the suppression of any evidence seized during an impermissible search or seizure. *See Herring v. United States*, 555 U.S. 135, 139 (2009) (noting that the "exclusionary rule . . . forbids the use of improperly obtained evidence at trial").

As the proponent of the motion to suppress, Bugg bears the burden of establishing that his Fourth Amendment rights were violated. *United States v. Coleman*, 923 F.3d 450, 455 (6th Cir. 2019) (citing *United States v. Witherspoon*, 467 F. App'x 486, 490 (6th Cir. 2012)). Generally, a defendant's showing that a warrantless search or seizure has occurred constitutes a *prima facie* showing of illegality. *United States v. Jackson*, No. 1:14-CR-29, 2015 WL 4509452, at *8 (E.D. Tenn. July 24, 2015) (citing *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007)). The burden then rests on the United States to show by a preponderance of the evidence that the search and seizure was reasonable. *Jackson*, 2015 WL 4509452, at *8 (citing *United States v. Matlock*, 415 U.S. 164, 164 n.14 (1974)).

## D.    THE STOP OF BUGG'S VEHICLE

The stop of a vehicle is considered a "seizure" under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10 (1996). Indeed, such a stop must be reasonable to be constitutional. In the context of a traffic stop, reasonableness does not require a warrant. *United States v. Brooks*, 987 F.3d 593, 598 (6th Cir. 2021). Instead, "an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012) (citing *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6

(6th Cir. 2004)). Here, there are two avenues which lead to the conclusion that the officers had sufficient constitutional authority to initiate a traffic stop.

### 1. <u>Probable Cause to Arrest Bugg</u>

In determining the reasonableness of a warrantless arrest, a court should "evaluate whether there was probable cause to believe that the suspect committed a crime or was in the process of committing a crime." *Fisher v. Jordan*, 91 F.4th 419, 424–25 (6th Cir. 2024) (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). Indeed, it is well-established that there are no bright line rules to determine whether probable cause exists; rather, probable cause is defined by fluidity and factual context. *United States v. Gates*, 462 U.S. 213, 232 (1983). An assessment of the probable cause to arrest an individual requires an "evaluation of the events leading up to the arrest," in view of the totality of the circumstances. *Fisher*, 91 F.4th at 425; *United States v. Brooks*, 270 F. App'x 382, 384 (6th Cir. 2008) ("When determining if a police officer had probable cause to conduct a warrantless arrest, [courts] look to the totality of the circumstances and decide 'whether the historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" (quoting *Maryland v. Pringle*, 540 U.S. 366, 370, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003))). Then, from the pre-arrest viewpoint, a court must "ask whether an objectively reasonable officer would conclude that there is a 'probability or substantial chance of criminal activity,' thereby justifying an arrest." *Fisher*, 91 F.4th at 425 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)). The United States has the burden of proving that probable cause existed at the time of arrest. *United States v. Porter*, 701 F.2d 1158, 1165 (6th Cir. 1983) (citing *United States v. Perez-*

*Castro*, 606 F.2d 251, 253 (9th Cir. 1979)).  Additionally, under Sixth Circuit precedent, law enforcement officers may stop a vehicle on public roads, even without a warrant, if "they have probable cause to believe that the occupants have committed a crime." *United States v. Brooks*, 987 F.3d 593, 598 (6th Cir. 2021).

Courts in the Sixth Circuit have repeatedly affirmed that evidence of a single controlled purchase provides probable cause sufficient for a warrantless arrest. *See, e.g.*, *United States v. Mack*, No. 1:13-CR-278, 2014 U.S. Dist. LEXIS 12197, at *16 (N.D. Ohio Jan. 31, 2014) (holding that evidence that a defendant recently sold heroin to a CI in a controlled buy was sufficient to establish probable cause for a warrantless arrest); *United States v. Keith*, No. 08-CR-360, 2010 U.S. Dist. LEXIS 795, at *15 (N.D. Ohio Jan. 6, 2010) (finding that evidence of two drug transactions created sufficient probable cause for an arrest warrant); *United States v. Bennett*, 439 F. App'x 501, 503 (6th Cir. 2011) (determining that a defendant's warrantless arrest was lawful where the arresting officer had evidence from a controlled buy with a CI, even in spite of allegations concerning the CI's reliability).  In the instant case, Bugg's arrest occurred after a substantial drug investigation.  That same investigation produced two controlled buys via a CI.  McIntosh testified that each controlled buy adhered to all general procedures and guidelines regarding CIs.  Additionally, each controlled buy was fully surveilled from start to finish and later debriefed with the CI to ensure reliability and corroboration.  When examined by the eyes of a "reasonable officer," these facts alone establish a "substantial chance of criminal

activity," and, thus, sufficient probable cause for Bugg's warrantless arrest for drug trafficking. *See Fisher*, 91 F.4th at 425.

Bugg challenges the existence of probable cause by questioning the CI's reliability. More specifically, Bugg suggests that the CI stole money from one of the controlled purchases. [DE 27, PageID# 162]. At the evidentiary hearing, however, McIntosh denied Bugg's conclusion, stating that both purchases were validated through pre- and post-searches, a post-buy debriefing, and covert audio surveillance (although he was not present), which did not indicate any suspicion activity on the part of the CI. [DE 27, PageID# 153]. In other words, although they did not directly observe the sale, two detectives met the CI at an arranged location, ensured that he did not have any drugs before the sale, monitored the sale with surveillance technology, and immediately retrieved the purchased items after the sale. Probable cause does not require prima facie proof, just a reasonable grounds for belief. *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005). The United States dutifully established that the controlled purchases were conducted in such a way to ensure absolute reliability on the part of the CI. Bugg's baseless claims that the CI "stole" money, without testimonial or actual evidence to support them, are insufficient to negate the CI's reliability and the existence of probable cause.

## 2. Probable Cause of a Traffic Violation / Reasonable Suspicion of an Ongoing Misdemeanor

The stop of a vehicle is also reasonable under the Fourth Amendment where "the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). Additionally, under Sixth Circuit

precedent, reasonable suspicion of an "ongoing misdemeanor," including traffic violations, is adequate justification for initiating a traffic stop. *United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008) (holding stop based on reasonable suspicion that defendant failed to keep a license plate clearly legible did not violate the Fourth Amendment); *United States v. Shelton*, 817 F. App'x 217, 219 (6th Cir. 2020) (applying reasonable suspicion standard to stop based on window-tint violation under Tennessee law). The United States offers two routes to establish the appropriate level of suspicion required to stop Bugg.

To begin, the United States argues that Bugg was swerving in violation of Kentucky Revised Statute ("KRS") KRS 189.290. Indeed, Owens testified at the evidentiary hearing that he observed Bugg watching him in the rearview mirror, not paying attention to the roadway, and swerving. When pressed on the issue, Owens was unable to recall the details—including number and manner of incidents—of the swerving. Regardless, the government successfully establishes reasonable suspicion to stop Bugg another way.

Owens testified that, prior to the interdiction, law enforcement officers met and discussed information about Bugg. During this meeting, officers were notified that Bugg's license had recently expired. KRS 186.510 provides, in relevant part, that "[t]he licensee shall have his or her license in his or her immediate possession at all times when driving a motor vehicle." With the knowledge that Bugg's license was expired on the date in question, Owens certainly had reasonable suspicion to believe

that Bugg was actively violating KRS 186.510, which is sufficient to initiate a traffic stop.

Bugg attempts to discredit this logic by arguing that that law enforcement officers cannot rely on a "stale" lookup of an individual's driver's license validity. In support of this argument, Bugg cites *United States v. Laughrin*, 438 F.3d 1245, 1247 (10th Cir. 2006), which held that an officer's knowledge that the defendant was driving without a valid license was too stale to be the basis for reasonable suspicion where the officer's knowledge was obtained at least twenty-two weeks prior to the stop. However, Bugg's argument misses the mark in the Sixth Circuit. In fact, the Sixth Circuit previously held that information regarding the offense of driving without a valid license, a continuing offense, takes longer to become stale. *United States v. Sandridge*, 385 F.3d 1032 (6th Cir. 2004). Further, the *Sandridge* court held that an officer's license lookup from twenty-two days prior was sufficient to create a reasonable basis to suspect that the defendant still lacked a valid license. *Id.* Here, Bugg's license expired on May 8, 2022, merely ten days before Bugg's vehicle was stopped. Thus, the timeline established does not allow sufficient time for the license lookup to become stale under Sixth Circuit precedent. Therefore, the United States has demonstrated that the officers had reasonable suspicion of an ongoing traffic violation to justify a warrantless stop of Bugg's vehicle under the Fourth Amendment.

### E.    THE SEARCH OF BUGG'S PERSON

In passing, the United States indicated that Bugg consented to a search of his person; however, the factual basis for this assertion was not developed at the evidentiary hearing. The United States further argues that officers possessed

reasonable suspicion that Bugg was armed and dangerous, which justified a pat down of his person. However, Owens testified that he did not have any information or indication that Bugg was armed and dangerous. [DE 27, PageID# 133]. In spite of this, the search of Bugg's person is justified by the search incident to a lawful arrest exception to the Fourth Amendment's warrant requirement.

Upon conducting a lawful warrantless arrest, "a law enforcement officer may conduct a full search of an arrestee's person incident to" that arrest. *United States v. Montgomery*, 377 F.3d 582, 586 (6th Cir. 2004). During this search, an officer may "search for and seize *any* evidence on the arrestee's person in order to prevent its concealment or destruction," including contraband and any instrumentalities, fruits, or evidence of a crime discovered during the search. *Chimel v. California*, 395 U.S. 752, 762–63 (1969) (emphasis added); *United States v. Stewart*, 315 F. App'x 554, 559 (6th Cir. 2009). In the instant case, although there was no arrest warrant, Bugg was lawfully arrested in connection to the two controlled buys and a search incident to that arrest was well-within the confines of the Fourth Amendment.

## F.   THE SEARCH OF BUGG'S VEHICLE

To justify the officers' search of Bugg's vehicle, the government stands on a theory of consent. Alternatively, Bugg argues that there is not sufficient evidence that he freely and voluntarily consented to the search of his vehicle. This Court finds the government's arguments more persuasive.

One of the exceptions to the Fourth Amendment's warrant requirement is consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Generally, consent must be "freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548–

49 (1968).  In contexts where the government asserts that a defendant consented to a search, it bears the burden of establishing, through "clear and positive testimony," that the consent was "unequivocal, specific, intelligently given, and not influenced by duress or coercion."  *United States v. Wilson*, 806 F. App'x 450, 453 (6th Cir. 2020) (first quoting *United States v. Salvo*, 133 F.3d 943, 953 (6th Cir. 1998); and then quoting *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008)).  In making a consent determination, "courts examine the totality of the circumstances, including the individual's 'age, his or her education and intelligence, the existence of advice concerning the nature of the constitutional right that is implicated, the length of detention prior to the request for consent, the nature of any prior questioning, and whether any physical punishment was involved.'"  *Lawson v. Creely*, 137 F.4th 404, 419 (6th Cir. 2025) (quoting *Morphis v. United States*, 110 F. App'x 527, 530 (6th Cir. 2004)).  Additionally, although "knowledge of the right to refuse consent is one factor to be taken into account," consent may still be valid in the absence of such knowledge. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

Here, Owens detailed that Bugg freely and voluntarily gave consent to search his vehicle.  In fact, Owens testified that he asked Bugg for consent to search his vehicle four or five times, with Bugg replying in the affirmative each time.  The police report is consistent with this testimony.

The personal characteristics of Bugg weigh in favor of the conclusion that the consent was voluntary.  Bugg is 62 years old.  There is no indication that he was unfamiliar with the law or of below-average intelligence.  Owens did not note any

issues interacting with Bugg, recalling that he interacted with Bugg at the initiation of the stop, learned that he did not have a driver's license in his possession, and eventually provided a Kentucky identification card from him. Although Owens does not recall if he informed Bugg of his right to refuse consent, Bugg's extensive experience with law enforcement and the justice system over the last forty years tends to indicate a working understanding of his constitutional rights. *See United States v. Canipe*, 569 F.3d 597, 604 (6th Cir. 2009) (considering a defendant's prior criminal convictions in evaluating his knowledge of his rights and susceptibility to intimidation tactics). Furthermore, even if Owens failed to advise Bugg of his right to refuse consent, that failure does not compel a finding that the consent was involuntary. *See United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (noting that law enforcement officers are under no obligation to inform criminal suspects of their right to refuse consent).

Similarly, the details of the detention weigh in favor of finding that consent was voluntary. Owens indicated that he asked Bugg for consent to search the vehicle at the beginning of the traffic stop. *See United States v. Valdez*, 147 F. App'x 591, 596 (6th Cir. 2005) (concluding that a "brief," thirty-minute detention, coupled with no record evidence of coercive conduct, is not suggestive of a coercive atmosphere such that consent is negated). Footage from Gabriel's BWC shows only Owens and two other uniformed officers present and near Bugg when Gabriel arrives at the scene, which points to a diminished officer presence when Owens obtained consent to search the vehicle. Moreover, the entire interaction occurred in the public parking lot of a

gas station on a busy Lexington roadway. *See United States v. Watson*, 423 U.S. 411, 424–25 (1976) (holding that custodial consent given on a public street, not in a police station, weighed in favor of finding that consent was voluntary).

Finally, although Bugg contends that the context "suggests" coercion, the record does not contain any evidence of overt coercion or duress. Prior to giving consent, Bugg was never placed in handcuffs or physically restrained. Rather, he was in a public parking lot, interacting with a single officer. Additionally, there is no evidence that officers made any physical threats or promises to Bugg. *See Watson*, 423 U.S. at 424–45 (finding voluntary consent where there was no overt act or threat of force claimed by the defendant, and the totality of the circumstances otherwise suggested that consent was voluntary).

In view of the totality of the circumstances, Bugg's consent was certainly freely and voluntarily given. Thus, the search of his vehicle was well-within the reasonable limits of the Fourth Amendment.

## G.    THE SEARCH OF BUGG'S HOTEL ROOM

The United States rests the constitutional validity of the warrantless search of Bugg's hotel room on a similar theory of voluntary consent. Conversely, Bugg predominantly argues that consent obtained during an illegal detention is presumptively invalid. In support, Bugg relies on the Sixth Circuit's decisions in *United States v. Lopez-Arias*, 344 F.3d 623, 630 (6th Cir. 2003), and *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004). Although Bugg's argument rests on a sound legal premise, this Court is of the opinion that Bugg's detention was

resoundingly lawful. Consequently, the argument that his consent was presumptively invalid cannot succeed.

Although it is undoubtedly true that in some situations an individual will enjoy a decreased expectation of privacy in a hotel room as compared to his home, the Fourth Amendment still applies. *See, e.g.*, *Stoner v. California*, 376 U.S. 483, 489 (1964) ("[W]hen a person engages a hotel room he undoubtedly gives 'implied or express permission' to 'such persons as maids, janitors or repairmen' to enter his room 'in the performance of their duties.'" (quoting *United States v. Jeffers*, 342 U.S. 48, 52 (1951))). Under the Fourth Amendment, individuals have a reasonable expectation of privacy in a hotel room. *United States v. Caldwell*, 518 F.3d 426, 429 (6th Cir. 2008). Therefore, the warrantless search of a hotel room must fall under an exception to the warrant requirement. *Id.* In the instant case, the United States claims that Bugg consented to the search of his hotel room. In evaluating the validity of Bugg's consent to the search of his hotel room, the same framework described in the above Section applies here.

At the evidentiary hearing, the United States offered only the testimony of McIntosh on the issue of Bugg's consent to search the hotel room. In effect, McIntosh testified that Bugg gave consent and signed a Kentucky State Police Consent to Search Form for the hotel room, which was also signed by Detective Tyler Morris and witnessed by Detective Ben Spaulding ("Spaulding"). [DE 27, PageID# 154]. He further testified that Bugg told officers the location of a firearm and narcotics in the room, which were found during the search of the room. The police report corroborates

these facts and adds context, explaining that Morris approached Bugg in the parking log and asked if Bugg would like to speak with him. [DE 20-1; Page ID# 62]. When Bugg agreed to speak, Morris escorted him to Spaulding's vehicle. Spaulding sat in the driver's seat of the vehicle, Bugg in the front passenger seat, and Morris in the back. Morris provided Bugg with *Miranda* warnings and explained that while he was detained, he was not under arrest. Bugg declined contacting an attorney and agreed to speak with Morris. Morris explained the evidence of the controlled purchases and asked if Bugg had anything else in his hotel room. Bugg explained that there was an ounce of methamphetamine and a firearm. In response, Morris asked Bugg for consent to search the hotel room. Bugg consented. Chavies and Spaulding transported Bugg to the hotel, where he let the officers into his hotel room. Subsequently, Bugg signed the consent form, and the search commenced.

Turning first to Bugg's personal characteristics, the Court recognizes that the same factors discussed above largely apply here and weigh heavily in favor of a finding that consent was voluntary. The primary distinction in this context is that Bugg received *Miranda* warnings before providing consent, meaning he was expressly informed of at least some of his constitutional rights.

The circumstances of detention in this context, however, present a more nuanced analysis. By the time Bugg consented, he was unquestionably detained and handcuffed. He was aware of the evidence that the officers possessed and was seated in a police vehicle. He was, however, placed in the front seat of the vehicle—a factor that diminishes coercive concerns. Additionally, only two officers were present in the

vehicle, and the consent occurred approximately fifteen minutes into the traffic stop. *See United States v. Valdez*, 147 F. App'x 591, 596 (6th Cir. 2005) (concluding that a "brief," thirty-minute detention, when coupled with no record evidence of coercive conduct, is not so suggestive of a coercive atmosphere that consent is negated); *United States v. Watson*, 423 U.S. 411, 425 (1976) (finding voluntary consent even where the defendant had been arrested and was in custody on a public street).

Additionally, the unchallenged police report reflects nonverbal acts indicative of consent. Bugg's action of letting the officers into the hotel room, which presumably included opening the door with his room key, establishes implied consent to search the room. *See United States v. Carter*, 378 F.3d 584, 588–89 (6th Cir. 2004) (holding that the defendant's action of stepping back from the door of his hotel room and letting officers enter constituted valid consent). Nothing in the record indicates that Bugg ever revoked such consent. Beyond the implied and oral consent, both McIntosh's testimony and the police report establish that Bugg executed a written consent form in the presence of multiple officers—an additional factor strongly supporting voluntariness.

At the evidentiary hearing, Bugg argued that the available evidence related to consent was hearsay. In fact, hearsay concerns were Bugg's only challenge to McIntosh's testimony. He did not challenge the credibility of the testimony or the police report, which was submitted as an exhibit to Bugg's own motion. Moreover, it is well-established that hearsay is admissible in suppression hearings. *United States v. Matlock*, 415 U.S. 164 (1974); *United States v. Killebrew*, 594 F.2d 1103, 1105 (6th

Cir. 1979).  Given the uncontroverted testimony and the unchallenged police report, the Court finds that there is clear and positive evidence of Bugg's free and voluntary consent to search his hotel room.

## III.   CONCLUSION

Upon thorough review, the Court concludes that the May 18, 2022, traffic stop and subsequent searches did not violate Bugg's Fourth Amendment rights. Therefore, the evidence found in each search and any fruits thereof should not be suppressed.  Accordingly,

**IT IS RECOMMENDED** that the District Court **DENY** the Motion to Suppress [DE 20], consistent with this Report and Recommendation.

The Court issues this Recommended Disposition under Federal Rule of Criminal Procedure 59(b) and 28 U.S.C. § 636(b)(1)(B).  Within **seven days (7)** after being served with a copy of this decision, any party may serve and file specific written objections to any or all findings or recommendations for determination, *de novo*, by the District Court.  The parties should consult the aforementioned statute and rule for specific appeal rights and mechanics.  Failure to make timely objections consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals.  *See United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981); *Thomas v. Arn*, 106 S. Ct. 466, 468 (1985).

Signed this the 4th of December, 2025.

MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY