UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | Crim. No. 5:25-cr-00084-GFVT-MAS-1 |
| v. | ) ) ) | **MEMORANDUM OPINION** **&** |
| STEVEN TROY BUGG, | ) ) | **ORDER** |
| Defendant. | ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Defendant Steven Troy Bugg's Objection to Report and Recommendation. [R. 29.] For the reasons below, the Court will overrule Bugg's objection and deny his motion to suppress.

**I**

Defendant Steven Troy Bugg was well-known to law enforcement before the day of the arrest in question. Law enforcement had Bugg under surveillance and conducted two controlled purchases with a confidential informant on April 20, 2022, and April 28, 2022. [R. 28 at 2]. The April 20th controlled purchase netted eight ounces of 99 percent pure methamphetamine in exchange for $1,600. *Id.* at 3. At the April 28th controlled purchase, the informant purchased 457 grams of 85 percent pure methamphetamine in exchange for $3,500. *Id.* at 4. In both instances, Bugg provided the drugs to the informant. The first controlled purchase took place in a hotel room, and the second controlled purchase took place in Bugg's rented vehicle. *Id.* at 3.

On May 18, 2022, law enforcement developed a plan to arrest Bugg. Informed by the controlled purchases and prior surveillance of Bugg, members of the Kentucky State Police

(KSP), Drug Enforcement/Special Investigations East (DESI), and the High Intensity Drug Trafficking Area Task Force (HIDTA) met to develop an interdiction plan. *Id.* at 4. The plan involved making a pretextual stop of Bugg as he left a hotel in Lexington.[1] This team knew that Bugg's license was either suspended or expired on the morning of this meeting. [R. 27 at 42]. The officer surveilling Bugg's hotel notified others that Bugg had left, and shortly thereafter KSP Sergeant Jesse Owens began tailing him in a marked police vehicle. [R. 28 at 4]. Owens testified that he pulled over Bugg after he noticed that "[Bugg] was watching me in the mirror and not paying attention to the road, basically, he was swerving." [R. 27 at 7].

Upon pulling into a gas station, Owens engaged with Bugg and asked him for his driver's license, which Bugg could not produce. [R. 28 at 5]. Owens then asked Bugg five times whether Bugg would consent to a search of his vehicle. *Id.* Bugg consented each time. While Owens searched the car, Bugg stood behind the vehicle and spoke to another officer. During his search of the vehicle, Owens discovered methamphetamine concealed in a tissue box. *Id.* At some point during the search Trooper Jack Gabriel arrived as another officer patted down Bugg. Gabriel then performed a more "invasive pat down" of Bugg and placed him in handcuffs. *Id.* After detaining Bugg, an officer discovered a bag of heroin on the ground that ostensibly fell from Bugg's pants as Gabriel searched him. *Id.*

At this point, Detective Tyler Morris placed Bugg in a police vehicle and read him his *Miranda* rights. *Id.* at 5–6. Bugg declined to speak to an attorney and began conversing with Morris. Morris, who had been involved in the April controlled purchases, told Bugg about these events and asked whether there was anything else in Bugg's hotel room. Bugg told Morris that the hotel room contained a gun and an ounce of methamphetamine. Morris then asked whether

---

[1] The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officers involved. *Whren v. United States*, 517 U.S. 806, 813 (1996).

officers could search the room, to which Bugg consented. Bugg also specified where in the room officers could find the gun and methamphetamine.

Two officers took Bugg to his hotel room at the Fairfield Inn. *Id.* at 6. Bugg let the officers into his room and signed a Kentucky State Police Consent to Search form. *Id.* The officers found a .380 caliber pistol, a digital scale, a glass pipe with methamphetamine residue, and several plastic bags containing a gross amount, with packaging, of 55.7 grams of methamphetamine. *Id.*

On July 3, 2025, a grand jury returned a three-count indictment against Bugg charging violations of 21 U.S.C. § 841(a)(1), which criminalizes the knowing and intentional distribution of 50 grams or more of methamphetamine. [R. 1]. On August 7, 2025, a grand jury returned a superseding indictment charging Bugg with three violations of 21 U.S.C. § 841(a)(1) and a fourth count under 21 U.S.C. § 922(g)(1), which criminalizes the possession of a firearm by a convicted felon. [R. 7]. At his arraignment, Bugg entered a plea of not guilty. [R. 12]. On September 19, 2025, Bugg through counsel moved to suppress all evidence seized on May 18, 2022. [R. 20]. Bugg argues that (1) neither probable cause nor reasonable suspicion supported the initial traffic stop, (2) the pat-down search was illegal, (3) Bugg did not provide clear consent to the vehicle search, and (4) the consent to search the hotel room obtained during the supposedly unlawful detention is invalid. *Id.* Judge Stinnett held a suppression hearing on November 8, 2025. On December 4, 2025, Judge Stinnet issued a Report and Recommendation concluding that the government's actions were lawful and recommending that the Court deny Bugg's motion to suppress. [R. 28]. Judge Stinnett set an objection period of seven days, and on December 11, 2025, Bugg filed his Objection to the Report and Recommendation.

3

II

Bugg raises two objections to Judge Stinnett's Report and Recommendation. The Court reviews this matter *de novo*. 28 U.S.C. § 636(b)(1). The Court reviews "those portions of the report or specified proposed findings or recommendations to which an objection is made." *Id.* "A specific objection 'explain[s] and cite[s] specific portions of the report which [counsel] deem[s] problematic.'" *United States v. Conley*, 290 F. Supp. 3d 647, 653 (E.D. Ky. 2017) (citing *Robert v. Tesson*, 507 F.3d 981, 944 (6th Cir. 2007)). General objections failing "to identify specific factual or legal issues from the report and recommendation" are not permitted. *Id.*

A

Bugg objects to Judge Stinnett's finding that Sergeant Owens had probable cause or reasonable suspicion to conduct the initial traffic stop. [R. 29 at 2]. Thus, the issue before the court is whether Owens had probable cause or reasonable suspicion to stop Owens on May 18, 2022.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The Fourth Amendment's prohibition against unreasonable searches and seizures 'extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest.'" *United States v. Flores*, 30 F. Supp. 3d 599, 602 (E.D. Ky. 2014) (quoting *United States v. Chandler*, 437 F. App'x 420, 425 (6th Cir. 2011)). "A traffic stop is justified and does not violate the Fourth Amendment 'when a police officer has reasonable suspicion of an ongoing crime or… when he

4

has probable cause to believe that a civil traffic violation has been committed.'"  An officer may also stop a vehicle where they "have probable cause to believe that the occupants have committed a crime."  *United States v. Brooks*, 987 F.3d 593, 598 (6th Cir. 2021).  Further, under the collective knowledge doctrine, police can also stop a motorist for traffic violations or other criminal activity witnessed by other officers and relayed to them.  *United States v. Lyons*, 687 F.3d 754, 765–66 (6th Cir. 2012).

An officer has probable cause for a stop if he had "reasonable grounds for his belief that a violation occurred, supported by less than prima facie proof but more than mere suspicion." *United States v. Matthews*, 422 F. Supp. 3d 1235, 1242 (W.D. Ky. 2019).  "The Court looks to whether the facts and circumstances within the officers' knowledge and of which they had reasonable trustworthy information were sufficient to warrant a man of reasonable caution in the belief that an offense has been or is being committed."  *Id.* (citing *United States v. Hughes*, 606 F.3d 311, 320 (6th Cir. 2010)).  The establishment of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."  *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983).

Officers can also rely on the less stringent reasonable suspicion standard to justify a traffic stop.  An officer has reasonable suspicion to conduct a brief investigative traffic stop if the officer has "a particularized and objective basis for suspecting the particular person stopped" has engaged in criminal activity.  *Kansas v. Glover*, 580 U.S. 376, 380 (2020) (citing *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)).  "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause."  *Id.* (quoting *Prado Navarette v. California*, 572 U.S. 393, 397 (2014)).

5

Bugg takes issue with much of the evidence underlying the government's argument that probable cause existed. The government contends that probable cause existed to stop Bugg because Sergeant Owens witnessed Bugg swerving in violation of Ky. Rev. Stat. § 189.290, Kentucky's careless driving statute. Of course, a police officer has probable cause to stop a car when he witnesses a civil traffic violation. *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). Bugg argues that "Owens admitted he could not recall whether Bugg ever left his lane, could not describe the nature or duration of the alleged swerving, issued no citation, and documented nothing." [R. 29 at 2]. The Court takes note of the fact that the suppression hearing took place nearly three and a half years after the date of the stop at issue.

Bugg cites two Sixth Circuit opinions holding that intra-lane weaving or momentary swerving does not justify a stop. *Id.* Neither are persuasive. Bugg first relies on *U.S. v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000), where the Sixth Circuit held that a police officer did not have probable cause for a traffic stop based upon that officer's witnessing of weaving in violation of a Tennessee statute. Subsequent cases have cast serious doubt on the authority and correctness of *Freeman*. *United States v. Chandler*, No. CRIM.A. 10-23, 2010 WL 2870874, at *8 (E.D. Ky. July 2, 2010), *report and recommendation adopted*, No. CRIM.A. 2:10-23-DCR, 2010 WL 2870723 (E.D. Ky. July 20, 2010), *aff'd*, 437 F. App'x 420 (6th Cir. 2011) (collecting cases). It certainly does not stand for the proposition that Bugg claims it stands for, given that the Sixth Circuit has subsequently held that probable cause for a traffic stop exists where an officer witnesses a civil traffic infraction. *Blair*, 524 F.3d at 748; *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020); *see also United States v. Hunter*, No. 24-1471, 2025 U.S. App. LEXIS 4743, at *6-7 (6th Cir. Feb. 26, 2025) ("When reviewing whether officers had probable cause to conduct a traffic stop, we must give 'due regard' to the trial court's opportunity to judge [the

6

officer's] credibility."). Bugg next relies on *U.S. v. Gross*, 550 F.3d 578, 583 (6th Cir. 2008), another case where the Circuit held that a police officer did not have probable cause for a stop based upon the same Tennessee statute at issue in *Freeman*. Subsequent courts have found *Gross* distinguishable by the facts of that case, where "the vehicular conduct involved represented what the court regarded as, essentially, a slow lane change." *See, e.g.*, *United States v. One Million, Thirty-Two Thousand, Nine Hundred Eighty Dollars in U.S. Currency ($1,032,980.00)*, 855 F. Supp. 2d 678 (N.D. Ohio 2012).

Indeed, the facts of *Freeman* and *Gross* are distinguishable from the facts of this case. Both cases involved Tenn. Code § 55-8-123, a statute that differs somewhat significantly in length and detail when compared to Ky. Rev. Stat. § 189.290. Kentucky's statute is broader, ordering that "[a] person shall not operate any vehicle *in a reckless or negligent manner* as to endanger persons or property in or near a highway, or in or near a highway work zone." Ky. Rev. Stat. § 189.290(4) (emphasis added). Drivers must operate their vehicles "*in a careful manner*, with regard to the safety and convenience of pedestrians and other vehicles." *Id.* (emphasis added). The Tennessee Code is much more specific: "A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with safety." Tenn. Code § 55-8-123(1). Tennessee's statute contains even further detail involving roadways with three lanes, passing using the center lane, preparing for a left turn, and how to pass statutorily defined slow-moving vehicles. *Id.* Put simply, Kentucky's statute is much broader and gives officers on the road the flexibility to determine, using their common sense, experience, and training, whether a motorist is operating a vehicle in a "reckless or negligent" manner that is not "careful . . . with regard to the safety and convenience of pedestrians and other vehicles."

7

Bugg further argues that the government cannot rely on the claim that officers knew Bugg's license was suspended. [R. 29 at 2]. He claims that the record contains "no evidence" that anyone "verified the status of Bugg's license on or near May 18, 2022." *Id.* But such evidence does exist from the testimony of officers involved in the investigation. On cross, Owens stated that "we were told that his license was suspended." [R. 27 at 19]. He admitted he could not remember the exact details of whether he checked for a suspended license, but this is unsurprising given that the suppression hearing took place almost three and a half years after arrest date. Bugg is correct that *United States v. Sandridge*, 385 F.3d 1032 (6th Cir. 2004), requires contemporaneous knowledge of a suspended or expired license. As argued at the suppression hearing, the officers had knowledge of this, including through the ongoing drug investigation against Grubb.

In any event, Sergeant Owens had both probable cause and reasonable suspicion to conduct the traffic stop. The facts and circumstances known to Owens on that date support the finding that he "had reasonable trustworthy information" to believe "that an offense had been or [was] being committed." *Matthews*, 422 F. Supp. at 1242. Owens was present at the meeting where the task force informed the gathered troopers that Bugg was under surveillance for drug trafficking, that he had sold drugs to a confidential informant on two occasions, and that his driver's license was suspended. [R. 27 at 6–7, 19]. Owens witnessed Bugg commit a traffic violation, stating in his opinion that Bugg was "not paying attention to the road in front of him" and that "he was paying more attention to me." *Id.* at 7. Owens, relying both on his own observations and those relayed to him by other officers in satisfaction of the collective knowledge doctrine, had probable cause to stop Bugg on the basis of the observed traffic violation and the suspended license.

Owens also had reasonable suspicion to conduct a brief investigative traffic stop because he had "a particularized and objective basis for suspecting" that Bugg had engaged in criminal activity. *Glover*, 580 U.S. at 380. Judge Stinnett correctly concluded that the knowledge of Bugg's license issue gave Owens reasonable suspicion to believe that Bugg was actively violating Ky. Rev. Stat. § 186.510, Kentucky's driver's license statute. But reasonable suspicion existed because Owens was aware of the drug trafficking investigation, including the controlled purchases. The first controlled purchase took place in a hotel room, and the second controlled purchase took place in Bugg's vehicle. Objectively, the fact that Bugg was driving his vehicle out of the hotel informs the particular suspicion that Bugg could have drugs on his person at this time. This inference, informed by the investigation, exceeds the "mere hunch" or "gut feeling" threshold required under the reasonable suspicion analysis. *United States v. McCallister*, 39 F.4th 368, 374 (6th Cir. 2022). For the foregoing reasons, the Court finds that Sergeant Owens had probable cause and reasonable suspicion to conduct the traffic stop.

**B**

Bugg's second objection focuses on the testimony of Scott McIntosh, a member of the Madison County Sheriff's Department assigned to the Drug Enforcement Administration in Lexington. [R. 27 at 39]. McIntosh is the case officer assigned to Bugg's investigation and testified at the suppression hearing. *Id.* at 40. McIntosh was not the original case officer—he took over after the previous co-case officers were either reassigned or retired. *Id.*

Labeled under a single objection to McIntosh's testimony, Bugg makes three objections to Judge Stinnett's Report and Recommendation. First, Bugg states that McIntosh's testimony did not establish probable cause to arrest Bugg. [R. 29 at 3]. Second, he argues that McIntosh's testimony did not establish that Bugg voluntarily consented to the hotel-room search. *Id.* at 6.

9

Finally, he objects to Judge Stinnett's reliance on the police report produced by Detective Tyler Morris, one of the lead case officers who supervised the controlled buys and who first heard Bugg's inculpatory statements after giving him *Miranda* warnings.[2]

Bugg's broad objection is that much of McIntosh's testimony consists of hearsay. "At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." *United States v. Raddatz*, 447 U.S. 667, 679 (1980). Such hearsay evidence must still have probative value and must be competent and credible. In the context of a suppression hearing, the Sixth Circuit allows hearsay evidence of statements by individuals who did not testify so long as a witness familiar with the events and under penalty of perjury presented the statements accurately. *United States v. Kellogg*, 202 F. App'x 96, 102 (6th Cir. 2006).

1

The Court first addresses the defendant's objection that McIntosh's testimony did not establish probable cause to arrest Bugg.

Courts may rely on hearsay evidence at a suppression hearing. *Raddatz*, 447 U.S. at 679. The evidence must, however, be credible and competent. *Fields v. Bagley*, 275 F.3d 478, 485 n.5 (6th Cir. 2001). At a suppression hearing, "the exclusionary rules, aside from rules of privilege, should not be applicable; and the judge should receive the evidence and give it such weight as his judgment and experience counsel." *United States v. Matlock*, 415 U.S. 164, 175 (1974).

Nothing from the record suggests that McIntosh provided information that is not credible or unsupported by other evidence that would be available at trial, such as the testimony of

---

[2] Tyler Morris did not testify at the suppression hearing due to a doctor's appointment for a serious shoulder injury. [R. 27 at 60].

10

Sargeant Owens. Further, it is not clear to the Court that the government's probable cause or reasonable suspicion determination for the traffic stop relies on McIntosh's testimony at all. Indeed, McIntosh's testimony barely covers the events of the stop, instead focusing on the controlled purchases and Bugg's signing of the KSP Consent to Search form. McIntosh's testimony frankly has nothing to do with the traffic stop and arrest of Bugg. The Court already found that Sergeant Owens had probable cause and reasonable suspicion to conduct the traffic stop, a part that McIntosh played no role in. For these reasons, the Court overrules Bugg's objection.

### 2

Bugg next argues that McIntosh's testimony cannot establish that Bugg voluntarily consented to the hotel-room search.

The rules of evidence, including the rule against hearsay, do not operate with full force at suppression hearings. *Matlock*, 415 U.S. at 172. Indeed, this is because there is a distinguishable difference between "proceedings to determine probable cause for arrest and search and those governing the criminal trial itself." *Id.* at 173 (citing *Brinegar v. United States*, 338 U.S. 160, 173 (1949)). Where the exclusionary rules are not applicable, the judge must "receive the evidence and give it such weight as his judgment and experience counsel." *Id.* at 175. The government must sustain its burden by proving a preponderance of the evidence that Mr. Bugg consented to the hotel-room search. The Sixth Circuit defines "preponderance of the evidence" as "evidence that is of greater weight, on balance, than that offered in opposition to it." *United States v. Beckley*, 715 F. Supp. 2d 743, 748 (E.D. Mich. 2010) (citing *Benge v. Johnson*, 474 F.3d 236, 248 (6th Cir. 2007)). In other words, the evidentiary burden is a

11

showing of that which is "more likely than not." *Id.* (citing *United States v. Moses*, 289 F.3d 847, 852 (6th Cir. 2002)).

Contrary to Bugg's assertions, the government is entitled to rely on hearsay evidence at the suppression stage to establish that Bugg gave consent to officers to search his hotel room. Thus, the government is free to rely on the contents of the police report and on McIntosh's testimony even though such evidence might not be admissible at trial without additional testimony to lay its foundation. Several factors indicate that government has met the preponderance of the evidence standard. First, Sargeant Owens' testimony and the police report confirm that Bugg freely gave consent from the beginning of his encounter with the police that day. *See* [R. 27 at 9]; [R. 20-1]. Bugg gave Owens permission to search his car. After being placed in handcuffs, Bugg told another officer that he had a bag of heroin in his crotch area. [R. 20-1 at 2]. Bugg declined to speak to an attorney even after receiving his *Miranda* rights, and told officers that he had methamphetamine and a pistol in his hotel room. Bugg gave officers permission to search his hotel room orally at this point, and then two officers drove him to the hotel. *Id.* The report states that Bugg "let us in his hotel room" and that he signed a consent to search form. That same form was presented at the suppression hearing, even though the officers who signed it were not there to testify.

Does this evidence, admissible for the purposes of a suppression analysis, on balance suggest that it is more likely than not that Bugg repeatedly consented to search requests, including a request to search his hotel room? The Court believes so. Bugg repeatedly gave officers permission to search his car and his hotel room. He spoke to officers and gave them incriminating information even after being given his *Miranda* rights. He told officers on separate occasions where they could find drugs on both his person and in his room. Officers did

12

not break down the hotel room's door or force a manager to open the room — Bugg let them in. To memorialize this consent, he even signed a form giving officers consent to search the room and assisted them in locating the drugs. *Id.* The undersigned's judgment and experience counsels that the evidence suggests that consent was freely given. At this stage, McIntosh's testimony is sufficient to support the Magistrate Judge's conclusion that valid consent existed to search the hotel room.

Judge Stinnett and Bugg both address the circumstances surrounding the voluntariness of Bugg's consent. Judge Stinnett wrote that the "circumstances of detention present a more nuanced analysis" before finding that, ultimately, the "uncontroverted testimony and the unchallenged police report" points to "clear and positive evidence of Bugg's free and voluntary consent to search his hotel room." [R. 28 at 20–22]. Bugg challenges the circumstances and argues that the environment of the arrest was overly coercive and thus any consent given was not truly voluntary. The Supreme Court has held that the Fourth and Fourteenth Amendments require that the government must demonstrate that consent was voluntary, and not the result of duress or coercion. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973). The Sixth Circuit's factors in assessing whether a defendant gave consent voluntarily include the defendant's understanding of his constitutional right, the defendant's personal characteristics, the length and nature of the police-citizen interaction, and the use of police coercion, subtle or otherwise. *United States v. Holland*, 522 F. App'x 265, 274 (6th Cir. 2013)

Bugg argues that several factors point to coercion, including the fact that he was handcuffed, the presence of multiple officers, that no officers testified that "he was told he could refuse consent," and that "no officer testified that force or threats were absent." [R. 29 at 7]. Notably, although this section of the objection purportedly addresses the hotel room search, these

13

objections appear to relate to Bugg's arrest at the gas station. In any event, none of these claims are compelling. Bugg consented to a search of his vehicle several times before he was ever in handcuffs, and being handcuffed in and of itself does not prevent a person from giving voluntary consent to a search. *United States v. Patterson*, 607 F. Supp. 3d 754, 760 (E.D. Mich. 2022). Multiple officers were present, but there is no claim that the officers drew their weapons, made false promises, or uttered threats against Bugg. *See United States v. Bowser*, 505 F. App'x 522, 526 (6th Cir. 2012) (citing *United States v. Canipe*, 569 F.3d 597, 603–04 (6th Cir. 2009) (holding that consent was voluntary despite presence of multiple armed officers)). As to the final two claims, Bugg asks the government to prove a negative, which the Court will not entertain.

The remaining Sixth Circuit factors ask the Court whether the defendant understood their constitutional rights, the defendant's personal characteristics, and the nature and length of the interaction. Bugg is no doubt aware of his constitutional rights given that he received *Miranda* warnings and he is a convicted felon who has navigated the criminal justice system in the past. [R. 28 at 16], *see also Canipe*, 569 F.3d at 604. Bugg has not indicated he possesses any personal characteristics that diminish his ability to freely consent to a search. *See, e.g., United States v. Montgomery*, 621 F.3d 568, 574 (6th Cir. 2010) (affirming denial of a motion to suppress where defendant did not present any evidence about his background such as education, intelligence, or other facts). Nothing about the length of the interaction indicates that Bugg withdrew his consent, especially considering that he gave consent to search the hotel room both at the scene of the arrest and then later at the hotel itself. For these reasons, the Court overrules Bugg's objection.

C

Finally, Bugg contends that the Report and Recommendation's reliance on the police report "is misplaced and cannot bolster McIntosh's unreliable testimony." [R. 29 at 8]. A party is not permitted to raise a new argument, for the first time, in objections to a Report and Recommendation.[3] *Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000). That failure to raise the argument before the Magistrate Judge constitutes waiver of that argument. *Id.* But even *in arguendo*, Bugg's challenge fails here for the same reason many of his other arguments failed: there is no bar against hearsay evidence at a suppression hearing, and Bugg has not raised legitimate questions about the validity of what is contained in the report. For these reasons, Bugg's objections to the Report and Recommendation are overruled.

III

Accordingly, and the Court being so advised, it hereby **ORDERED** as follows:

1. Defendant Bugg's Objection to the Report and Recommendation **[R. 29]** is **OVERRULED**.

2. Judge Stinnett's Report and Recommendation **[R. 28]** is **ADOPTED** as and for the opinion of the court.

3. Defendant Bugg's Motion to Suppress Evidence **[R. 20]** is **DENIED**.

4. Jury trial remains scheduled for **January 6, 2026**, pursuant to [R. 23].

---

[3] It must be noted that Bugg himself relied on the police report as an attachment to his own Motion to Suppress. See [R. 20-1].

15

This the 23d day of December 2025.

Gregory F. Van Tatenhove
United States District Judge